[S. F. No. 10735. In Bank.—October 10, 1923.]

SACRAMENTO AND SAN JOAQUIN DRAINAGE DISTRICT, etc., et al., Petitioners, v. CHARLES G. JOHNSON, as Treasurer, etc., et al., Respondents.

[1] SACRAMENTO AND SAN JOAQUIN DRAINAGE DISTRICT — CLAIMANTS FOR WORK UNDER CONTRACTS ENTERED INTO BETWEEN ACT OF 1917 and ACTS OF 1919—EXTENT OF RIGHTS.—The rights of contract holders to be paid for reclamation and flood control work done under their contracts with the reclamation board entered into between the date of the passage and approval of the act of 1917 providing for the levy and collection of an assessment for the purpose of paying for such work, and the time of the passage and approval of the three legislative acts of 1919 (Stats. 1919, p. 1092; Stats. 1919, p. 1122; Stats. 1919, p. 1209), are bounded and confined by the law as it then existed, providing for the means and sources from which the claims arising under such contracts were to be paid, namely, from the moneys to be derived from an assessment or assessments to be levied upon the land owners within the particular drainage district in accordance with the provisions of said act of 1917; and the only vested or enforceable right which the holders of such claims for work done under said contracts could have would be the right to require that assessments should be seasonably levied and collected by the

reclamation board for the purpose of providing a fund for the payment of their said claims.

[2] ID.—CLAIMANTS UNDER CONTRACTS ENTERED INTO AFTER PASSAGE OF ACTS OF 1919 — EXTENT OF RIGHTS.—The vested rights of claimants for reclamation and flood control work done under contracts with the reclamation board entered into after the passage and approval of the acts of 1919 (Stats. 1919, p. 1092; Stats. 1919, p. 1122; Stats. 1919, p. 1209) are bounded and defined by the terms of such enactments.

[3] ID.—PAYMENT—RIGHT OF CLAIMANTS AGAINST STATE.—As against the state itself the claimants for payment for work done under contracts with the reclamation board had no right to demand the payment of their claims nor the passage of any law providing for the same, since as between themselves and the state there existed no contractual relation.

[4] ID.—REDUCTION OF CLAIMS TO REGISTERED WARRANTS—RIGHTS OF WARRANT HOLDERS.—When the claims of contract holders antedating the passage and approval of the several acts of 1919 had been reduced to the form of registered warrants pursuant to the provisions of section 15 of the Reclamation Board Act, as adopted in 1913 and amended in 1915, the rights of these contract claimants as general creditors were augmented so as to entitle the holders of registered warrants based upon said claims to have such warrants paid out of such moneys as had actually reached the drainage district fund from any source in the order of their registration; but said warrant holders had no right either to compel the state to replete said fund by direct appropriations of money from the state treasury or by the adoption of any other plan or method of repleting said fund and thereby facilitating the payment of said warrants.

[5] ID.—BONDING ACT OF 1919 (STATS. 1919, p. 1092) — POWER OF RECLAMATION BOARD — DISCRETION. — Under the bonding act of 1919 (Stats. 1919, p. 1092), providing for the sale and issuance of bonds of the Sacramento and San Joaquin Drainage District, it was a matter entirely within the discretion of the reclamation board to determine whether or not it would adopt and attempt to carry through a bond issue under the provisions of said act and this discretion could at no time have been compelled by claimants for work done under contracts entered into prior to the passage of said act; nor could such claimants, after its attempted exercise, demand any advantage therefrom until the experiment of a bond issue had eventuated in the successful sale of the bonds and the deposit of the sum realized therefrom in the special fund against which the warrants of such claimants had been drawn.

[6] ID.—VESTED RIGHTS OF WARRANT HOLDERS. — Until the bonding act of 1919 (Stats. 1919, p. 1092) had been fruitful in the sale

of bonds and the deposit in the particular fund in the state treasury upon which warrants for claims for work done under contracts entered into subsequent to the passage of said act were drawn, such warrant holders had no vested or enforceable right to receive any money in payment of their claims save that dependent upon the contingency of the sale of bonds and deposit of their proceeds as provided for in said act.

[7] ID.—APPROPRIATIONS UNDER ACT OF 1919 (STATS. 1919, p. 1209) —APPLICATION TO PAYMENT OF WARRANTS — VESTED RIGHTS. — Holders of outstanding warrants, for work done either before or after the adoption of the several acts of 1919 (Stats. 1919, p. 1092; Stats. 1919, p. 1122; Stats. 1919, p. 1209), had no vested right to an application of the appropriation made by one of said acts (Stats. 1919, p. 1209), or of any portion thereof, to the payment of their warrants.

[8] ID.—ACT OF JUNE 2, 1923—CONSTRUCTION OF.—Under the act of June 2, 1923, authorizing the reclamation board to cancel authorized but unsold bonds to an amount equaling the amount of money then on deposit in the state treasury, and authorizing the money on deposit in the state treasury at the time such bonds are so canceled to be credited to a fund entitled "Sacramento-San Joaquin Drainage District Fund," the legislature of 1923, in directing the devotion of the appropriations already paid into the state treasury under the appropriation act of 1919 (Stats. 1919, p. 1209), but not deposited in any special fund, to the emergency uses provided for in the act of 1923, was not only acting entirely within the scope of its reserve powers granted by the act of 1919, but was not invading any right possessed by claimants for work done under previous contracts to any other disposition of said fund.

[9] ID.—APPLICATION OF APPROPRIATIONS UNDER ACT OF JUNE 2, 1923 —EFFECT UPON CLAIMANTS.—The application of appropriations made by the act of 1919 (Stats. 1919, p. 1209) to the cancellation of unsold bonds as authorized by the act of June 2, 1923, to an extent equal at their par value to the appropriations received, will not have the effect of diminishing to that extent a resource upon which claimants for work done under contracts entered into before and subsequent to the passage of the acts of 1919 (Stats. 1919, p. 1092; Stats. 1919, p. 1122; Stats. 1919, p. 1209) claim they are entitled to rely for the ultimate payment of their claims, that resource being the gross amount of the bond issue.

[10] ID.—RIGHTS OF RECLAMATION DISTRICT NO. 1500 AND CLAIMANTS UNDER PREVIOUS CONTRACTS.—The claim of Reclamation District No. 1500 against the Sacramento and San Joaquin Drainage District, arising out of the purchase by the latter from the former on July 28, 1922, of reclamation works, not having been reduced

to the form of a registered warrant drawn against any particular fund of said drainage district at the time of the approval of the act of 1923, and said Reclamation District No. 1500 being up to said time merely a general creditor of the drainage district, said reclamation district could not be affected injuriously by the operation and effect of the act of 1923, nor could the existence of its claim as a general creditor be held to in anywise affect the rights of previous contract claimants, whatever they may be, whose warrants had been registered prior to the making of said contract and who had thereby become entitled to priority in the payment of their claims out of the particular fund upon which their warrants were drawn, when the same had been repleted upon the sale of the bonds provided for in the bond issue.

PROCEEDING in Mandamus to compel the State Treasurer and State Controller to cancel bonds of the Sacramento and San Joaquin Drainage District. Writ granted.

The facts are stated in the opinion of the court.

Stephen W. Downey for Petitioners.

U. S. Webb, Attorney-General, and Robert T. McKisick. Deputy Attorney-General, for Respondents.

T. T. C. Gregory for Certain Warrant Holders and Edward F. Treadwell for West Side Land Owners, *Amici Curiae.*

RICHARDS, J., *pro tem.*—The petitioner herein applied to this court for a writ of mandate commanding the respondents herein, as state treasurer and state controller, to cancel certain bonds issued under and in accordance with the act of the legislature approved May 27, 1919, entitled "An Act to Authorize the Issuance and Sale of Bonds of the Sacramento and San Joaquin Drainage District" based upon assessments levied by the reclamation board upon lands in said district (Stats. 1919, p. 1092), to the extent and in the sum of $610,000, and further commanding said state treasurer to credit the sum of $610,000 to the Sacramento and San Joaquin Drainage District Fund, particularly designated as "Sutter-Butte By-pass Assessment No. Six, Emergency Fund," and further commanding the respondent Ray L. Riley, as controller of the state of California, upon compliance with the above commands on the part of the state

treasurer, to issue a warrant drawn on the state treasury in the sum of $7.67 in favor of the reclamation board and payable out of said sum of $610,000 when credited to said emergency fund, and directing the said treasurer to pay said warrant out of said fund. The foregoing acts on the part of the respondents are sought to be compelled under and in compliance with the provisions of an act of the legislature adopted on June 2, 1923, purporting to amend section 34 of the Reclamation Board Act, which latter act was originally adopted at the extra session of the legislature in 1911 (Stats. 1911, p. 117), and has been from time to time amended, as will hereinafter appear. An answer to said petition has been presented by the respondents which raises the question of law as to the sufficiency of said petition and which further proceeds to set forth certain facts which do not contradict, but rather amplify, the facts set forth in the petition, and which answer also advances certain deductions on the part of said respondents furnishing reasons why, as a matter of law, said petition should not be granted. The chief issue presented for our consideration by these pleadings involves the validity of the said act of the legislature approved June 2, 1923.

In order to a clear comprehension of the issues thus presented it will be necessary to have in mind the history and course of state legislation upon the subjects of reclamation and flood control in the region affected by the course and overflow of the Sacramento River, and particularly of that portion thereof which now constitutes the Sacramento and San Joaquin Drainage District. The history of the conditions which evoked such legislation, beginning with the year 1911 and occupying the attention of every legislative session between that time and the year 1923 inclusive, is quite clearly set forth in our decision in the *Matter of the Proceedings to Validate Sutter-Butte By-Pass Assessment No. 6, etc.,* 191 Cal. 650 [218 Pac. 27].

The basis of respondents' refusals, respectively, to do the acts required by the resolutions and orders of the reclamation board relative to the retirement of the unsold bonds of assessment district No. 6, to the amount and extent of $610,000, and the deposit of the money so applied to the redemption of said bonds in the emergency fund in the state treasury upon which the warrant of the petitioner has

been drawn, is that the statute of 1923, which proposes to legalize such a diversion of moneys of the state from the purposes and specific funds to which it is claimed that they had been devoted by previous legislation, is void for the reason, chiefly, that prior thereto and pursuant to such previous legislation, contracts had been entered into by the reclamation board, the execution of which had resulted in the creation of claims against said drainage district, which had taken on the form of warrants drawn upon the specific funds of said district and made payable out of such funds by the express provisions of such previous legislation; and that the diversion from said funds of the specific moneys provided for by the act of 1923 above referred to would amount to a violation of the obligations of said contracts and would thus be void under the federal and state constitutions. A brief *résumé* of the particular legislation and of the acts of the reclamation board thereunder in pursuance of which said contracts were entered into, said claims created, and said warrants drawn will be necessary in order to determine the merits of the foregoing contention.

The work of flood control of the waters of the Sacramento River and its tributaries, of improvement of navigation, and of the reclamation of the lands susceptible to overflow from said river and its tributaries had its inception in the act of the legislature passed at the extra session of 1911, to which reference has above been made. This act was amended and supplemented by the act of 1913 (Stats. 1913, p. 252) whereby the Sacramento and San Joaquin Drainage District was created and its boundaries defined, and by which also the powers of the reclamation board called into being by the earlier act were greatly enlarged. By the terms of said last-named act the reclamation board was empowered to proceed by purchase, condemnation, or other lawful means, with the acquisition of all lands, rights of way, and other property and material necessary or requisite for by-passes, weirs, cuts, canals, levees, overflow channels, and other ways and means for achieving the purposes of the act; and was also empowered to make contracts and to do all other things necessary to the accomplishment of such purposes. In order to the exercise of these powers and the achievement of these purposes the reclamation board was, by section 13 of said act of 1913, directed to levy and col-

lect an assessment upon the lands within said drainage district. All moneys collected by means of such assessment were in the first instance to be paid to the county treasurer of the county within which the lands affected thereby were situated and were by him to be deposited in the state treasury to the credit of said drainage district in a fund to be designated and known as the ''Sacramento and San Joaquin Drainage Fund,'' and which moneys when so deposited were to be paid out upon warrants of the state controller issued upon said fund whenever drafts drawn upon said fund were presented by the reclamation board and when there was sufficient money in said fund to pay the same. The act expressly provided that all moneys raised by such assessment should be expended only for works of reclamation and other expenditures beneficial to the lands so assessed. In case there was not sufficient moneys in said drainage district funds to pay said warrants drawn for such purposes when presented, the state treasurer was directed to indorse on said warrants the date of presentation and to register the same and thereafter such warrants were to bear interest at the usual rate and were to be paid in the order of their registration, and were to be considered as contracts in writing for the payment of money by said district. Under the foregoing provisions of the statutes of 1911 and 1913, as further amended and amplified by the act of 1915 (Stats. 1915, p. 1338), the work of reclamation and flood control proceeded within the area covered by said drainage district, the preliminary stages of said work performed prior to the act of the reclamation board in the levy and collection of funds through the process of an assessment as provided for in said acts, being paid for by special appropriation made by the legislatures of 1911, 1913, 1915, and 1917. In November of the latter year the reclamation board had so far proceeded with the preliminaries as to be prepared to adopt, and it did then adopt, a plan or project for the carrying forward of the main work of reclamation and flood control within that certain portion of the general drainage district which it then designated as ''Sutter-Butte By-Pass Project No. 6,'' and thereupon and at said time proceeded with the work of levying an assessment for the collection of funds to be applied in the manner above provided to the payment of the costs and expenses incident to the carrying

out of such plan or project. Contracts were thereafter from time to time entered into for the performance of such work and as from time to time money came to be due and payable upon such contracts the reclamation board drew its drafts upon the assessment district funds in the state treasury for the payment of the same and warrants were thereupon drawn upon the state treasurer for the same. For a reason which will presently appear, the particular drainage district fund upon which these warrants were drawn became presently depleted, with the result that said warrants when presented and unpaid were registered by the state treasurer in the manner above set forth as payable out of said fund. The depletion of said fund and consequent registration of said warrants were due to the delays and impediments in the course of the levy and collection of the assessment from which the funds were to be derived for the repletion of the said fund and the payment of the claims and the warrants payable out of the same. While the work of reclamation and flood control was thus proceeding, and while the reclamation board was struggling with the delays and impediments in the way of collection of the assessment which was to provide the means of payment for such contract work, the legislature of 1919 met and was promptly made aware of the delays and difficulties in which the district was involved. In order to relieve the situation created by the urgent necessity of proceeding with the projected work of reclamation and flood control and by the fact that the claims and demands thus far incurred during the progress of said work were accumulating in the form of registered unpaid interest-bearing warrants, the legislature adopted three enactments having special reference to the situation above outlined and intended to supply a means for relieving the same. These three acts were each approved on May 27, 1919, and were each to take effect on July 25, 1919, and since they had relation to the same subject matter, and since they each referred to the other and were thus expressly interrelated, they should be read together for purposes of interpretation. The first of these acts to be considered is the act entitled "An Act to Authorize the Issuance and Sale of Bonds of the Sacramento and San Joaquin Drainage District based upon assessments levied by the reclamation board upon lands in said district." (Stats. 1919, p. 1092.) The

second of said amendments (Stats. 1919, p. 1122) consisted of certain specific amendments to the act of 1911 and the later acts of 1913 and 1915 amending the same. The only one of said amendments which is germane to the question before us is that one which consisted in the addition of a new section to the Reclamation Board Act, numbered section 34, to be more particularly hereinafter reviewed. The third of said enactments (Stats. 1919, p. 1209) was an act making an appropriation of $3,000,000 from the state treasury "for the purpose of co-operation in the construction of such works included in and provided for by that certain project heretofore adopted by the reclamation board known as Sutter-Butte By-Pass Project No. 6 of the Sacramento and San Joaquin Drainage District." The intent and purpose of this act, as expressed in section 2 thereof, was to provide a total of $3,000,000 for the purpose expressed in section 1 thereof, while by section 1 it was provided that such appropriation when paid to the reclamation board was to be applied to the purposes set forth herein *"as it is now or may hereafter be provided by law."* The said appropriation was payable as follows: $10,000 upon the act becoming a law, $300,000 upon the first day of July, 1921, $300,000 upon the first day of July, 1922, and $300,000 on the first day of July of each year thereafter until the whole amount of said appropriation had been paid over to the reclamation board.

Before dealing more particularly with these three contemporaneous acts of the legislature of 1919 it will be proper to consider the state of the indebtedness of the drainage district which is represented in outstanding unpaid and registered warrants issued upon claims for reclamation and flood control work done during the past several years under contracts with the reclamation board. We are not precisely informed by the record before us as to the inception of said work, nor of the exact dates when these claims came into being thereunder which have ripened into the warrants which are at present outstanding and unpaid, nor are we exactly informed as to when such work ceased, nor as to when the last of said claims in point of time merged into a warrant and was registered by the state treasurer. We are informed by the petitioner herein that the first of said warrants to be issued on account of such work bore a date as

early as January 5, 1918, and from this date it may be fairly inferred that all of the contracts under which reclamation and flood control work was done in said drainage district were entered into and proceeded with after the enactment of the act of 1917 (Stats. 1917, p. 1191), empowering the reclamation board to proceed with the levy and collection of an assessment upon the lands of said district for the purpose of paying for such work as could be lawfully charged against the property of the land owners within said district. Between said date and the date of the approval of the several acts of 1919, according to the averments of the petition herein, claims for approximately $1,340,358.47 had been registered in the form of warrants for work done prior to the passage and approval of said acts. [1] As to the rights of these contract holders to be paid for work done under their said contracts entered into between the date of the passage and approval of the act of 1917 providing for the levy and collection of an assessment for the purpose of paying for such work, and the time of the passage and approval of said acts of 1919, it would seem to be clear that they were bounded and confined by the law as it then existed, providing for the means and sources from which the claims arising under such contracts were to be paid, viz.: From the moneys to be derived from an assessment or assessments to be levied upon the land owners within said drainage district in accordance with the provisions of the statute of 1917, and that the only vested or enforceable right which the holders of such claims for work done under said contracts could have would be the right to require that assessments should be seasonably levied and collected by the reclamation board for the purpose of providing a fund for the payment of their said claims. [2] As to claimants for work done under contracts entered into after the passage and approval of the acts of 1919 the vested rights of these claimants are bounded and defined by the terms of those several enactments. Altogether these outstanding claims and warrants coming into being between January 5, 1918, and the date of filing the petition herein, amount, with interest calculated to July 1, 1923, to the sum of $6,957,465.08. [3] As against the state itself the claimants for payment for work done under contracts with the reclamation board had no right to demand the payment of

their claims nor the passage of any law providing for the same since as between themselves and the state there existed no contractual relation. Neither did these contract holders having claims antedating the passage and approval of the several acts of 1919 have any vested right to enforce their claims arising out of work done under said contracts against the reclamation board or the drainage district by any other method than that of an assessment for the payment of said claims since that was the only statutory mode in existence at the time such contracts were entered into, and hence that mode was the measure of the powers of the board in entering into the same. [4] When the claims of these contract holders had been reduced to the form of registered warrants pursuant to the provisions of section 15 of the Reclamation Board Act, as adopted in 1913 and amended in 1915, the rights of these contract claimants as general creditors were augmented so as to entitle the holders of registered warrants based upon said claims to have such warrants paid out of such moneys as had actually reached the drainage district fund from any source in the order of their registration. But said warrant holders had no right either to compel the state of California to replete said fund by direct appropriations of money from the state treasury or by the adoption of any other plan or method of repleting said fund and thereby facilitating the payment of said warrants Such, we think, must be held to be the extent and limitation of the vested rights of the contract claimants and warrant holders prior to the adoption of the several statutes which the legislature enacted in 1919 in an endeavor to relieve the then entangled and embarrassing situation.

Pursuant to the act of the legislature of 1917 empowering the reclamation board to proceed with the levy and collection of an assessment for the payment of claims arising out of the construction of the Sutter-Butte By-Pass Project No. 6, the said reclamation board, in the month of November of that year, initiated proceedings for the levy and collection of such assessment and thereafter, somewhat tardily it is true, and in the face of protracted litigation challenging the legality of such assessment, has proceeded with the statutory steps toward the enforcement of the same. This assessment, through proceedings instituted in accordance with the provisions of the act of 1919 (Stats. 1919, p. 1092) was vali-

dated and such validation was affirmed by this court upon appeal in its recent decision, to which reference has above been made (191 Cal. 650 [218 Pac. 27]). The amount of the estimated cost of completion of the construction of the Sutter-Butte By-Pass Project No. 6 as finally fixed by the reclamation board for the purposes of such assessment was $8,155,798.70. The total amount of claims for work done upon said project under construction contracts and for which warrants have been issued and registered and are now outstanding is, with interest computed up to July 1, 1923, the sum of $6,956,465.08. It would thus appear that the holders of these outstanding warrants for work done under contracts in the construction of the Sutter-Butte By-Pass Project No. 6, prior to the acts of 1919, have been accorded every right to which they were entitled under the statutes in force when such contracts were entered into, to be assured payment of their said claims through the levy and collection of an assessment which was to provide, and which is in the course of providing, ample funds for the payment of all outstanding warrants based upon such claims. As to the holders of claims or warrants for work done under contracts with the reclamation board subsequent to the passage and approval of the several acts of 1919, it is clear that the vested rights, if any, of this class of claimants are to be measured by the provisions of the Reclamation Board Act as modified by these several acts.

The respondents herein, purporting to represent the holders of these outstanding and unpaid warrants of both classes, insist that the claimants for work done under contracts entered into with the reclamation board subsequent to the passage and approval of the act of 1917, have gained some additional rights by virtue of the provisions of one or the other of the statutes of 1919, to the terms of which reference has above been briefly made. This claim will require a more particular consideration of the provisions of each of said acts relied upon as supporting the same. The first to be considered is the bonding act. (Stats. 1919, p. 1092.) By the terms of this act it was provided that whenever any assessment levied by the reclamation board upon lands within the Sacramento and San Joaquin Drainage District had been completed to the point where the said board was ready to make its order approving the same, the

said board might at the time of making said order and as a part thereof determine that in its judgment it would be for the best interests of the owners of land in said drainage district affected by said assessment to issue bonds for the purpose of obtaining money to pay the cost of the work or other expenses for which such assessment was levied; and in the event it did so determine, then the subsequent proceedings in and about the matter of such assessment and the collection thereof and all other proceedings for the raising of money to be used for the purposes for which said assessment was levied were to be as in this act provided, notwithstanding any other provisions in regard thereto in said Reclamation Board Act contained. The act then proceeded to provide that in the event the reclamation board did so determine to issue bonds, as above provided, its first step in relation thereto was to be that of instituting judicial proceedings for the validation of its said assessment upon which such bond issue was to be predicated, and that upon the validation of such assessment, by and in accordance with the judgment entered in such judicial proceeding, the said assessment and the lists thereof conforming with such judgment should, by the reclamation board, be filed in the offices of county treasurers respectively of the counties wherein lay the lands affected by such assessment, and such assessment and lists, when so filed, should constitute a lien upon such lands and the amounts due thereon should, within thirty days thereafter, be paid to said respective county treasurers by the owners of the lands subjected to such lien, whereupon the lien of such assessment should, as to the land owners paying said assessment, cease. At the expiration of said thirty days, if any portion of said assessment remained unpaid, the reclamation board was required to call an election in that part of said drainage district affected by said assessment for the purpose of determining whether the money necessary to pay the cost of the works and other expenses for which said assessment had been levied should be raised by calls upon the assessment remaining unpaid or by the issuance of bonds as provided in said act and as theretofore determined upon by said board; and if, upon such election, a majority of the votes cast thereat was in favor of the issuance of such bonds, they should accordingly be issued and when so issued should by the reclamation board be de-

livered to the state treasurer; and when so received by the state treasurer said bonds should be placed to the credit of the said drainage district and thereafter said bonds should by the state treasurer be sold when and as directed by the reclamation board for the best price obtainable therefor, but in no event for less than ninety-five per cent of the face value of such bonds and the accrued interest thereon; the money derived from such sale, if any, of said bonds to be by the state treasurer placed to the credit of that portion of the Sacramento and San Joaquin Drainage District affected by said assessment and in a fund to be designated as the construction fund of the assessment upon which said bonds were based and which fund was to be drawn upon and expended for the payment of warrants drawn by the state controller at the request of the reclamation board in payment for the work and other expenditures for which said assessment had been provided. The act then goes on to provide that when the bonds of the said drainage district have been authorized and issued as above set forth, the reclamation board should determine the amount of said assessment to be from time to time collected for the payment of the principal and interest of said bonds as the same should become due, and should proceed with the collection of the same by the procedure provided for in said act, the sum so received through the collection of said assessments to be paid in the first instance to the county treasurer of the county wherein the lands affected by said assessment were situated, to be by him transmitted to the state treasurer and to be placed by the latter to the credit of the bond fund of said drainage district and to be devoted to the redemption of said bonds when due. The act finally provided that if, within one year from the time when said bonds had been authorized to be issued, as above provided, they should not have been sold or disposed of, the reclamation board might, in its discretion, cancel all proceedings in relation to such bond issue and thereafter call for the payment of assessments in such installments as it should then determine and in accordance with the terms of the Reclamation Board Act.

From the foregoing *résumé* of the bond issue act of 1919, it will be seen that the state legislature, in an apparent endeavor to hasten not only the work of reclamation and flood control within said drainage district as projected and thus

far carried forward under the previous enactments but also to expedite the payment of claims already accrued under contracts for such work and of warrants issued in recognition of the validity of such claims, attempted to make a radical change in the method theretofore provided for meeting the payments due or to become due upon such claims and warrants. The holders of such claims and warrants as were then outstanding for work done prior to the passage and approval of said bonding act might possibly have objected to such change in method as providing a less certain or more dilatory means for the payment of the same. No such objection, however, appears to have been made and the fair inference is that the holders of such claims and warrants expected their chances for speedy payment of the same to have been enhanced thereby. It is difficult to perceive how any change, in what these claimants have been pleased to term their vested rights, has been effected by the provisions of said bonding act. [5] It was a matter entirely within the discretion of the reclamation board to determine whether or not it would adopt and attempt to carry through a bond issue under the provisions of the said act and this discretion could at no time have been compelled by these claimants prior to its exercise. Nor could they, after its attempted exercise, demand any advantage therefrom until the experiment of a bond issue had eventuated in the successful sale of the bonds and the deposit of the sum realized therefrom in the special fund against which the warrants of these claimants had been drawn. No such sale or deposit has ever been made and hence the additional rights of these warrant holders, if any were created by said bond issue act, have never so far ripened as to have entitled them to receive any money whatever from the special fund in the state treasury upon which their warrants have been drawn, since the record herein discloses that none of the bonds provided for by said bonding act and authorized and issued in compliance therewith have ever been sold. The warrant holders have therefore been in nowise advantaged thus far by the adoption of the bonding act nor by any proceedings instituted thereunder for an issue of bonds which have thus far been barren of results. As to the claimants for work done since the passage and approval of said bonding act the same reasoning applies. [6] Until such bonding act had been fruit-

ful in the sale of bonds and the deposit in the particular fund in the state treasury upon which these warrants were drawn, they had no vested or enforceable right to receive any money in payment of their claims save that dependent upon the contingency of the sale of bonds and deposit of their proceeds as provided for in said act.

The respondents herein, however, claim that these warrant holders would have been advantaged by the adoption of the bonding act and by the proceedings taken thereunder by the reclamation board had the provisions of the three contemporaneous acts adopted by the legislature of 1919 been given the effect contemplated by it at the time of their adoption.

The second of said acts of 1919 to be more particularly considered is the act adding section 34 to the Reclamation Board Act (Stats. 1919, p. 1122). The first paragraph of said section 34 as thus amended provides that all moneys which should thereafter be paid to the reclamation board by the state of California under the several previous acts making appropriations of money to be expended by or under the direction of said board to aid in carrying out the project adopted by said board for Sutter-Butte By-Pass assessment No. 6, and all moneys paid to such reclamation board under any future modifications or amendments to said acts "or by any law of similar import which has been or may be hereafter adopted by the legislature of the State of California, shall be applied on said Sutter-Butte By-Pass assessment No. 6 by said reclamation board to the *pro rata* payment of such portions of said assessment as are based upon flood control benefits" in the manner specified in said section. The second paragraph of said section 34, referring to the provisions of the preceding paragraph thereof, reads in part as follows: "The money so received by the reclamation board from the state shall, unless bonds based upon said assessment shall have been authorized by law, be by the reclamation board paid over forthwith to the state treasurer and be credited to the funds of said assessment to be used and expended in the same manner as funds collected from land owners upon said assessment. But if at the time of the receipt of any such money by the reclamation board from the state, bonds based upon said assessment shall have been authorized by law, the money so received from the state

shall be deposited by the reclamation board with the state treasurer to be held as a special fund for the redemption of such bonds and shall, under the direction and as required by the reclamation board, be applied to the payment and cancellation of such bonds." The remainder of the section proceeds to give in detail the manner of such application.

The third in the order of passage of the said acts of 1919 was the act providing for the appropriation of the sum of $3,000,000 from the state treasury for the purpose, as expressed in section 1 of said act "of co-operation in the construction of public works included in and provided for by that certain project heretofore adopted by the reclamation board known as Sutter-Butte By-Pass project No. 6 of the Sacramento and San Joaquin Drainage District." The act providing for this appropriation does not in itself provide for the deposit of the sums of money to be paid in installments during the decade following the date of said appropriation in any particular fund subject to the control and disposition of the reclamation board, nor does it provide for what particular purpose the moneys derived from said appropriation are to be used by said board other than by the general provision thereof that the money thus appropriated is to be paid to said reclamation board "for the benefit of said Sacramento and San Joaquin Drainage District, in connection with said Sutter-Butte By-Pass project No. 6, or any modifications or amendments thereof that may hereafter be made, in accordance with law, *the same to be applied as it is now or may hereafter be provided by law.*" It is to be noted, however, in this immediate connection, that the contemporaneous act of 1919 amending section 34 of the Reclamation Board Act does contain a provision having direct reference to the appropriation provided for in the act immediately under review. It is embraced in that portion of said amendatory act which provides that all money which may be paid to the said reclamation board to be expended under the direction of said board in aid of carrying out the project adopted by the reclamation board for the Sutter-Butte By-Pass assessment No. 6 under any statute then in existence "or by any law of similar import which has been or may hereafter be adopted by the legislature of the state of California shall be applied on said Sutter-Butte By-Pass assessment No. 6 by said reclamation board to the *pro rata*

payment of such portions of such assessment as are based upon flood control benefits''; and said amendatory act further provides that ''the money so received by the reclamation board from the state shall, unless bonds based upon said assessment shall have been authorized by law, be by the reclamation board paid over forthwith to the state treasurer and by him credited to the funds of said assessment to be used and expended in the same manner as funds collected from land owners upon said assessment. But if at the time of the receipt of any such money by the reclamation board from the state bonds based upon said assessment shall have been authorized by law the money so received from the state shall be deposited by the reclamation board with the state treasurer to be held as a special fund for the redemption of such bonds and shall, under the direction and as required by the reclamation board, be applied to the payment and cancellation of such bonds.''

Such was the condition of the law relating to the execution of the plan or project of the reclamation board for reclamation and flood control within the Sacramento and San Joaquin Drainage District No. 6 prior to and including the legislation of 1919, a *résumé* of which has just been made. The holders of the claims for work done from the year 1917 on and up to the adoption of the several acts of 1919 were to be paid the sums due them under the terms of their respective contracts for such work primarily derivable from an assessment or assessments to be levied and collected from the land owners of the drainage district benefited by said work when such assessment or assessments had been paid into the state treasury and credited to the particular fund upon which warrants representing their said claims had been drawn. By the bonding act of 1919 a substitute method of payment was devised by which bonds of the drainage district were to be voted, issued and sold, the money derived therefrom to be deposited in the state treasury to the credit of the particular fund upon which these warrants were to be drawn. In the event of the authorization, issuance, and sale of such bonds, the moneys of said drainage district derivable from such assessment or assessments as had been approved and ordered by the reclamation board was not to be paid immediately into the fund devoted to the payment of the claims of said warrant holders but was

to be paid into a fund in the state treasury known as the bond fund and was to be applied to the redemption of such of the bonds of the drainage district as had been sold and the proceeds applied to the payment of said warrants. As to appropriations made by the state in aid of such project, these, in the absence of any other express direction, were to be applied to the payment of claims and warrants arising out of the prosecution of said project, unless bonds had been authorized by law and by the reclamation board as the substituted source for the funds to be applied in payment of such claims; but in the event that such bonds had been so authorized, such state appropriations were to be deposited by the reclamation board with the state treasurer to be by him held as a special fund for the redemption of such bonds, with the reservation, however, made by the legislature in the appropriation act of 1919, that the appropriation of $3,000,000 therein made was to be applied "as it is now or may hereafter be provided by law." While the law was in this condition; while the assessment which had been authorized and approved by the reclamation board as the primary source from which the claimants of moneys due for work done under said construction contracts were to be paid was being delayed by litigation; while the reclamation board had determined upon and authorized a bond issue from the sale of which bonds a more immediate resource was expected to provide a means for the payment of outstanding warrants for work done upon said project, the funds of the reclamation board were enriched by the payment of certain installments on account of the said appropriation of $3,000,000 as provided in said appropriation act. This sum of money amounted, in the spring of 1923, to $610,000 and was in the way of being further repleted by the payment of an additional installment of $300,000 on July 1, 1923, when the fourth payment fell due according to the terms of the act making said appropriation. This sum of $610,000 had not been deposited in any particular fund for the apparent reason that none of the bond issue of the drainage district had been sold and there was, therefore, as yet no occasion for the sequestration of this or any other money in the special bond fund provided for by the amendment to section 34 of the Reclamation Board Act; nor was said money derived from said appropriation available for the payment of out-

standing warrants at said time under the expressions of said amendment to section 34 of said Reclamation Board Act. [7] This being the state of the law and of the facts with respect to said sum of $610,000 it is impossible to conceive what basis the holders of outstanding warrants, for work done either before or after the adoption of these several acts of 1919, could have for their claim of a vested right to an application of said sum of $610,000 or of any portion thereof to the payment of their warrants, unless it might be held to consist in the claim that if said bonds were not sold or salable and if for that reason their issue was withdrawn under the terms of the act providing for their issuance, said warrant holders would be entitled to fall back upon the assessment for the payment of their claims, in which event they would have become entitled under the terms of said amendment of the Reclamation Board Act to the application of all moneys derived from state appropriations to the special fund of the drainage district from which they were entitled to have their warrants paid in the order of their registration. This argument might have a certain persuasiveness were it not for the particular terms of the act by which said appropriation was made and by which it was expressly provided that said appropriation was to be applied "as it is now or may hereafter be provided by law." This express reservation of power in the legislature to direct the application of this particular appropriation to other uses by the reclamation board in the course of construction of said public works negatives the possession of any vested right in the holders of outstanding warrants to have the same or any portion thereof irrevocably applied to the payment of their warrants whenever it shall appear that the legislature has made application thereof to other uses in the exercise of its reserve of power so to do. It is to be noted in this connection that the bonding act in at least one essential respect denies to claimants and warrant holders for contract work thus far done the right to have the entire amount of said bond issue of or any sum derived from the sale of such bonds applied preferentially to the payment of their claims, since the act provides in section 40 thereof: "With the money received from the sale of bonds, or with said bonds as hereinbefore provided, the reclamation board as the managing body of said Sacramento and San Joaquin drainage

district shall proceed with the construction and completion or carrying into execution of the works or project for the purpose of which the assessment upon which such bonds are based was levied, in order that the same may be carried out and completed according to the best judgment of said board and without unnecessary delay.'' When this section of said act is read together with its contemporaneous act making the $3,000,000 appropriation it will appear that the legislature intended that the funds derivable by the reclamation board from either source might be used to pay for either past or future construction work untrammeled by any vested rights in the holders of claims or warrants for work already done.

We come now to a consideration of the act of the legislature approved June 2, 1923, the provisions of which the petitioner herein seeks to have enforced by a writ of mandate issued in the instant proceeding. The legislature by the terms of said act undertook to exercise the power expressly reserved to it by the provisions of the acts of 1919 above considered. It did so by the adoption of a further amendment to the Reclamation Board Act as enacted in 1919 by adding thereto the following provision: ''If, however, bonds based upon said assessment shall have been authorized, but said bonds or any of them, shall not have been sold, upon the receipt of any sum of money under said act or acts of similar import, and thereafter and prior to the sale of said bonds, or any of them, the reclamation board may order the cancellation of such number of said bonds so authorized, but not sold, as will, at par, equal the amount of money then on deposit in the state treasury, which may legally be used for the purpose of canceling such unsold bonds as hereinbefore provided and the total of the bonds to be issued shall be reduced by such amount of the money on deposit in the state treasury, and no bonds shall be sold to an amount in excess of the amount originally authorized, as reduced by the bonds so canceled at par. The land owners shall be credited with an amount equal to the amount of bonds so canceled, said sum to be applied on the Sutter-Butte by-pass assessment number six in the *pro rata* payment of such portions of said assessment as are based upon flood control benefit set opposite any tract of land in the same manner and to the same extent as hereinbefore provided, so that the total amount credited on said assessment for flood control

benefit shall equal the money on deposit in the state treasury. The money on deposit in the state treasury at the time these bonds are so canceled, shall thereupon be credited to a fund entitled 'Sacramento-San Joaquin drainage district fund, Sutter-Butte by-pass assessment number six, emergency fund' which fund is hereby created and shall be paid out on warrants of the controller on said fund upon order of the reclamation board, and the controller is hereby directed to issue warrants upon said fund whenever drafts of the reclamation board on said fund shall be presented to him, and the state treasurer is hereby directed to pay such controller's warrants when there is sufficient money in said fund.'' The intent of this amendment to section 34 of the Reclamation Board Act as expressed in a further provision of said act of 1923 was as follows, viz.: ''To make said funds available for the immediate use of the reclamation board in contracting for the completion of, Sutter-Butte by-pass project number six, and the reclamation board shall contract on a cash basis for additional work included in said project and assessment, but not yet done, and the pay for which funds are not available, and shall meet the payment on said contract or contracts out of said emergency fund hereby created to the extent thereof'' The act of 1923, by the provisions of section 2 thereof, was made an urgency measure to go into immediate effect, for the reason, as declared therein, that ''the legislature hereby declares that it deems it necessary for the immediate preservation of the public health and safety that this act shall go into immediate effect by reason of the following facts to wit'': That unless sufficient levees included in project number six, but not yet built and to construct which funds are not available, are constructed without delay, the effect will be to overflow and greatly damage a large area of valuable land within the boundaries of project number six and damage levees already constructed, all of which will imperil the property and safety of the inhabitants within said boundaries and the land owners assessed by said assessment, number six''; etc. It is impossible for us to conceive how any vested rights of the holders of claims or warrants for contract work already done under any of the previous acts providing for the reclamation and flood control of the Sacramento and San Joaquin Drainage District can be injuriously affected by the provisions of the

foregoing act. These claimants have never at any time been entitled by the provisions of any previous acts, as we have seen, to receive any money whatever from the state or from the drainage district until the source from which such moneys were to be derived for the payment of their claims or warrants, whether that source was an assessment or a bond issue and sale or a direct appropriation from the state treasury had resulted in the actual deposit in the special fund expressly set apart and designated as the fund to be devoted to the payment of their said claims and of their said warrants based thereon in the order of their registration. So long as the assessment method was the only means provided for the repletion of said special fund from which these claims were payable, the utmost right of said claimants was that of insisting that such assessment should be ordered, levied, and collected and the amount realized therefrom deposited in said special fund, as provided by law. When the legislature by the bond issue act of 1919 undertook to substitute said authorization and issue of bonds in the manner and to the extent provided in said act, the utmost right of those of said claimants holding claims or warrants for contract work done prior to the passage of said act was either to object to said proceeding as an invasion or postponement of their rights under the previous assessment method or to accept said substitute therefor as the method more likely to expedite the payment of their claims, in which event they must be held to have consented to await the sale of said bonds, which these claimants could by no means compel, and the deposit of the moneys derived therefrom in the particular fund upon which their warrants had been drawn; and even this contingent right was subject to the power of the reclamation board, under the express terms of section 40 of the bonding act, to apply said bonds or the moneys derived from the sale thereof to future construction work. In the event said bonds were not sold within one year after the authorization of their issue and were for that reason canceled by the reclamation board; or in the event that any portion thereof not sold were applied to other construction work; or in the event that said bonds were sold and the money derived from such sale devoted to other construction work, these contract claimants had no other recourse but to fall back upon the assessment, require its collection and the

application of its proceeds to the proper fund from which fund claims were to be payable and against which their warrants had been drawn. As to appropriations by the state in aid of said project, these were matters of grace which these contract claimants could by no means compel the state to exercise and over which the legislature had complete control. [8] In the case of the particular appropriation of the sum of $300,000 by the legislature of 1919, such control over the destination of its installment payments was expressly reserved in the act making the appropriation, and it therefore follows that the legislature of 1923, in directing the devotion of the sum of $610,000 already paid into the state treasury under the terms of the former act but not as yet deposited in any special fund, to the emergency uses provided for in said act, was not only acting entirely within the scope of its reserve powers, but was not invading any right possessed by these claimants to any other disposition of said fund. [9] It is contended, however, that the application of said sum of $610,000 to the cancellation of said unsold bonds to an extent equal at their par value to said sum of $610,000 has diminished to that extent a recourse upon which these claimants were entitled to rely for the ultimate payment of their claims, that resource being the gross amount of the bond issue. There are several answers to this contention, the first of which is that already suggested, that these contract claimants have no vested right to payment out of any resource provided by these several statutes for the raising of money to be devoted to the payment of their claims, at least until the moneys to be derived therefrom have finally reached the special fund out of which alone their registered warrants are to be paid. Whether that fund shall be repleted through the sale of the unsold bonds and the deposit of the money derived therefrom in the said special fund is a pure contingency, the happening of which they have no power to compel and upon which no vested right could be predicated. There is another, and it would seem sufficient, answer to this contention. It is that the amount at par value of the unsold bonds, after the deduction therefrom of the block of bonds to be retired and canceled under the provisions of the act of 1923, is approximately $7,418,147.75. The total amount of registered and outstanding warrants with interest computed to July 1,

1923, amounts to a sum not in excess of $6,957,465.08. If these remaining bonds should be sold for a sum not less than 95 per cent of their par value, as provided in the statute, there would still be realized therefrom an amount amply sufficient to pay the warrants of these claimants in full. Their rights, if any, would not therefore be injuriously affected by the proposed cancellation of said bonds to the extent of $610,000 at their par value, as provided for in said statute and proposed by the reclamation board. It is, however, further urged by the respondents herein that in addition to the aforesaid sum of outstanding warrants payable through the sale of said bonds there has been another and further indebtedness created by the reclamation board and made chargeable upon the funds of said drainage district, and which, added to the amount of such warrants, has rendered the entire sum payable out of the bond issue in question much larger than the original amount of such bond issue. The indebtedness referred to is that arising out of a contract entered into on July 28, 1922, between the reclamation district, representing said drainage district, and Reclamation District No. 1500, whereby it has been agreed that the drainage district shall take over the reclamation works of said reclamation district for the purchase price of $2,876,566.60, of which sum it was agreed that a sum of $1,000,000 was to be immediately paid, the balance to be payable at a later date, out of the assessment which had theretofore been ordered and levied upon the lands within said drainage district. [10] It appears, however, from the record before us that the claim of the Reclamation District No. 1500 for the aforesaid sum of money had not yet been reduced to the form of a registered warrant drawn against any particular fund of said drainage district at the time of the approval of the act of 1923 in question and that with regard to said claim the said Reclamation District No. 1500 was up to said time merely a general creditor of the drainage district, holding no registered warrant for its said claim. It could not, therefore, be affected injuriously by the operation and effect of the act of 1923, nor could the existence of its claim as a general creditor of the drainage district be held to in anywise affect the rights of such contract claimants, whatever they may be, whose warrants had been registered prior to the making of said contract and who had

thereby become entitled to priority in the payment of their claim out of the particular fund upon which their warrants were drawn, when the same had been repleted upon the sale of the bonds provided for in said bond issue.

The respondents herein make certain other contentions which we do not deem to have sufficient merit to deserve separate consideration. Our conclusion is that the act of 1923, upon which the petitioner herein relies, is valid, and hence that said petitioner is entitled to the relief which it seeks upon this application. The claim upon which the petitioner's said application is predicated is one arising out of a contract for work done within said drainage district under and in pursuance of the emergency provisions of the statute of 1923. It is ordered that the writ of mandate issue as prayed for in said application.

Lennon, J., Lawlor, J., Waste, J., Kerrigan, J., Seawell, J., and Wilbur, C. J., concurred.

Rehearing denied.