[Sac. No. 3924. In Bank.—November 13, 1926.]

# SACRAMENTO AND SAN JOAQUIN DRAINAGE DIS-TRICT, etc., et al., Petitioners, v. RAY L. RILEY, as Controller, etc., CHARLES G. JOHNSON, as Treasurer, etc., Respondents.

[1] RECLAMATION DISTRICTS—SACRAMENTO AND SAN JOAQUIN DRAIN-AGE DISTRICT—SUTTER-BUTTE BY-PASS PROJECT NO. 6—APPRO-PRIATION OF MONEY FOR—ACT OF 1919.—Under the provisions of the act of May 27, 1919 (Stats. 1919, c. 556), providing for the appropriation of moneys in the state treasury, not otherwise appropriated, for the benefit of the Sacramento and San Joaquin Drainage District, in connection with the Sutter-Butte By-Pass Project No. 6, it is the present duty of the State Controller to draw and deliver to the Reclamation Board his warrant for such sums as have been made available for the uses of said board from the installments of 1925 and 1926 of said appropriation, and it is the duty of the state Treasurer to pay said warrant, the funds to be applied by the Reclamation Board as provided in section 1 of said appropriation act.

[2] ID.—DIFFERENT ACTS PASSED CONTEMPORANEOUSLY—CONSTRUCTION OF.—The appropriation act of 1919 and the two other acts having application to the affairs of the Sacramento and San Joaquin Drainage District passed contemporaneously with the first act are for the purposes of interpretation to be read together.

[3] ID.—COST OF WORK—PROCEDURE FOR RAISING FUNDS—ACTS OF 1919.—The acts of 1919 (Stats. 1919, c. 556, pp. 1122, 1092), as they existed prior to the year 1923 provided a precise statutory mode of procedure for raising funds required to pay the cost of work of reclamation and flood control within the Sacramento-San Joaquin Drainage District; and the mode thus provided is the measure of the powers and duties of those state agencies and officials who are charged with the prosecution of said work and with the disposition of funds from the several sources in payment of the cost of such work and of the outstanding warrants which evidence such cost.

[4] ID.—SALE OF BONDS—METHOD.—The mode or method for the sale of bonds of the Sacramento and San Joaquin Drainage District under the act of 1919 (Stats. 1919, p. 1092), consists in the submission of sealed proposals or bids for such portion of the bonds as the bidder or bidders wish to purchase at the time and place fixed for the sale of said bonds in the notice of sale given by the state Treasurer, at which time and place the latter opens the bids and awards the purchase of the bonds

or any part thereof to the highest responsible bidder. Such bid or bids may be in a sum above par, or at par with accrued interest, but if the highest bid is not equal to par and accrued interest the state Treasurer must notify the Reclamation Board of the highest bids received and may, if directed by it, reject all bids.

[5] ID.—CONDITIONAL OFFER TO PURCHASE BONDS—FAILURE TO COMPLY WITH STATUTE.—The offer by owners and holders of registered unpaid warrants drawn against "Sutter-Butte By-Pass Project No. 6" prior to July 27, 1919, to purchase bonds of the Sacramento and San Joaquin Drainage District, based upon and secured by "Sutter-Butte By-Pass Assessment No. 6," at par to an amount equal to the amount which can be redeemed out of moneys accrued for the years 1925 and 1926 under the state appropriation, provided proceeds from said bond sale are deposited for the liquidation of warrants drawn against "Sutter-Butte By-Pass Assessment No. 6" in the order of their registration, and provided said bonds so purchased be forthwith redeemed out of said moneys so available for bond redemption, utterly fails to comply with the requirements of the bonding act regulating the mode and manner by which the bonds of said district may be bid for and sold.

[6] ID.—WARRANT HOLDERS—PURCHASERS OF BONDS.—The warrant holders in respect to the purchase of bonds of the Sacramento-San Joaquin Drainage District are in no different position as bidders from any other would-be purchaser of said bonds, and neither the state Treasurer nor the Reclamation Board would be justified in selling such bonds to any person who might happen to offer to purchase the same at *par* without any regard for or attempted compliance with the rigid requirements of the statute regulating the mode and manner of their disposal.

[7] ID.—PUBLIC SALE—REASON FOR.—One of the main reasons why bonds of public bodies or agencies are required to be sold at public bidding, after notice, is that they may be sold, if possible, for a sum *above par,* if a responsible bidder in such sum can thus be secured.

[8] ID.—PAYMENT OF WARRANTS—MANDAMUS.—A writ of *mandamus* should issue, upon the petition of the Reclamation Board, directing the state Controller to forthwith draw his warrant or warrants in favor of said board for the sum available for redemption of bonds based upon and secured by Sutter-Butte By-Pass Assessment No. 6, and directing the state Treasurer, upon the due presentation of said warrant or warrants, to deposit said sum in the state treasury to be held as a special fund for said purpose.

[9] ID.—APPROPRIATION ACTS OF 1919—CONSTITUTIONALITY OF.—The legislature had the power by the several acts of 1919 to provide for an appropriation of public money to be applied to the redemption of bonds issued or to be issued under said acts, although the proceeds from the sale of such bonds had been or were to be devoted to the payment of outstanding warrants issued prior to July 27, 1919, the date of said enactments, and which warrants had been issued in the prosecution of the work of reclamation and flood control undertaken in pursuance of the Reclamation Act of 1911, and of the amendments thereto made prior to the year 1919; and said acts did not violate sections 31 and 32 of article IV of the constitution, relating to gifts of public money.

[10] ID.—RECLAMATION AND FLOOD CONTROL—PUBLIC PROJECT.—The work of reclamation and flood control within the boundaries of the Sacramento and San Joaquin Drainage District is essentially a public project undertaken by the state of California in its interest and in the interest of its people at large.

[11] ID.—STATE AGENCIES.—The state legislature in distributing the proposed work of reclamation and flood control among the various reclamation and drainage districts which were formed for its prosecution under the general control of the Reclamation Board, was not to be understood as creating separate and independent entities for the carrying forward of such purposes, but was calling into being certain agencies of the state for the more convenient handling of the intricate and involved details of such a gigantic undertaking.

[12] ID.—PUBLIC WORK.—The fact that the state of California saw fit to commit the details of the prosecution of the work of reclamation and flood control to the various reclamation and drainage districts provided for in the several and successive legislative enactments creating these agencies and defining the scope of their activities, procedure and powers within the same, is not to be taken to have in any degree affected the attitude of the state toward the project in its entirety as to it being a public work conceived and carried forward chiefly for the benefit of the state and of its people at large; nor could the fact that the owners of land lying within the areas to be affected and benefited by said project and work would also be directly benefited through the restoration of their land to fertility and cultivation be held to affect the right and power of the state to provide from its public treasury all of the money required in the course of the undertaking and carrying to completion said work.

[13] ID.—BURDEN OF LAND OWNERS—POWER OF LEGISLATURE TO DE-
TERMINE.—The fact that the legislature, in the adoption of the
plan or project for the prosecution of reclamation and flood
control and for the provision of funds required therefor, by
the enactments of 1913, 1915 and 1917, saw fit to impose the
chief burden of providing such funds upon the land owners
within the areas which were, or were to be, directly and
beneficially affected through the prosecution and completion of
said plan or project, did not, in any manner or to any extent,
affect or diminish the power of the state to determine what
portion of the burden of the cost of such improvement it would
bear, nor how, in what manner, to what extent nor at what
time it would resolve by appropriate legislation to assume and
bear the same, or such proportion thereof as the development of
such work might disclose to be just, practical and proper in
order to carry the same to a successful consummation.

[14] ID.—APPROPRIATION BY STATE—POWER OF STATE.—The fact that
the legislature in connection with the appropriation of the sum
of $100,000 which it made in 1913 for the use of the Reclama-
tion Board (Stats. 1913, p. 276) declared that the state should·
not be liable, directly or indirectly, for any obligation, claim
or liability of any kind or character, arising under, or by reason
of said act, or any of the provisions thereof, in excess of
the sum appropriated, cannot be held to have limited the
power of the state to make such further appropriations or
direct the application thereof to the payment of the cost of
such work as the progress thereof might seem to require.

[15] ID.—RIGHT OF STATE TO BEAR COST OF WORK.—In view of the
essentially public nature of reclamation and flood control pro-
jects and therefor the right of the state to pay the entire
cost of their prosecution from inception, the state may in
any stage of the work assume and bear such portion of the
burden as it may see fit, although for the time being it has
laid the burden upon the land owners of the district, and it
does not thereby violate the constitutional inhibition against
gifts of public money.

(1) 36 C. J., p. 1028, n. 19 New.   (2) 36 Cyc., p. 1151, n. 47.
(3) 36 C. J., p. 1028, n. 19 New.   (4) 36 C. J., p. 1028, n. 38.
(5) 36 C. J., p. 1028, n. 38.   (6) 36 C. J., p. 1028, n. 40 New.
(7) 36 C. J., p. 1028, n. 29 New, 40 New; 38 C. J., p. 668, n. 96,
p. 672, n. 65, 66.   (8) 38 C. J., p. 667, n. 84, p. 672, n. 58 New.
(9) 36 Cyc., p. 885, n. 47.   (10) 36 Cyc., p. 894, n. 33.   (11) 36
C. J., p. 1007, n. 98.   (12) 36 Cyc., p. 894, n. 33.   (13) 36 C. J.,
p. 1028, n. 19 New.   (14) 36 Cyc., p. 895, n. 43 New.   (15) 36
C. J., p. 1028, n. 19 New.

APPLICATION for a Writ of Mandate to direct the State Controller and State Treasurer to perform certain acts. Writ granted.

The facts are stated in the opinion of the court.

Downey, Brand, Seymour and Dunn, Stephen W. Downey, and Fred R. Pierce for Petitioners.

U. S. Webb, Attorney-General, and Robert W. Harrison, Chief Deputy Attorney-General, for Respondents.

Devlin & Devlin, *Amici Curiae.*

T. T. C. Gregory for Warrant Holders.

RICHARDS, J.—The petitioners herein apply to this court for the issuance of a writ of mandate to be directed to the defendant Ray L. Riley, as Controller, and to Charles G. Johnson, as Treasurer, of the state of California, commanding each of these state officials to severally do and perform certain acts as set forth in said application. The official acts thus sought to be compelled are such, according to the averments of the petitioners, as have arisen in the course and as the result of a long and involved series of events which have attended the history and development of that vast project having for its purpose the reclamation and flood control of the region lying along the course of the Sacramento River and which has become known as "Sutter-Butte By-Pass Project No. 6." The details of the legislative and judicial history of that project have been already several times set forth in recent decisions by this court and need not be again reviewed for the purposes of the instant case. (*Sacramento & San Joaquin Drainage Dist.* v. *Johnson,* 192 Cal. 211 [219 Pac. 442]; *Sacramento & San Joaquin Drainage Dist.* v. *Riley,* 194 Cal. 624 [229 Pac. 957].) The petitioners here are "The Reclamation Board of the State of California," and Sacramento and San Joaquin Drainage District, a state agency under the management and control of said Reclamation Board. The petitioners, after setting forth the progress of the plans for reclamation and flood control

within said district and the steps taken toward the levy and collection of an assessment upon the lands within the same for the purpose of paying the cost thereof, and the validation of such assessment by judicial proceedings conducted in accordance with law, and the proceedings undertaken for a bond issue in aid of such assessment and the validation thereof by such further judicial action as was provided by law for such purpose, proceeded to allege:

"That for purposes of co-operation in the construction of the public works included in and provided for by the Reclamation Board in said 'Sutter-Butte By-Pass Project No. 6,' the state of California did by an act approved May 27th, 1919, and which became effective July 27th, 1919 (Stats. 1919, c. 556), appropriate out of any moneys in the state treasury not otherwise appropriated for the benefit of the Sacramento and San Joanquin Drainage District in connection with said 'Sutter-Butte By-Pass Project No. 6' the sum of $3,000,000.00 'to be applied as it is now or may hereafter be provided by law by the said Reclamation Board in connection with said Sutter-Butte By-Pass Project No. 6 of the said Sacramento and San Joaquin Drainage District.' "

The appropriation of $3,000,000 provided for in the foregoing act was to be payable in certain annual installments of $300,000, extending over a period of ten years, commencing on July 1, 1921, and to be payable on the first day of July during said successive years down to and including the year 1930. The petitioners allege that there is at present in the state treasury the sum of $590,920.92 derived from such appropriation and from the last two installments which have become available therefrom in pursuance of said act, which said sum of money the petitioners assert the Reclamation Board is presently entitled to have deposited to its credit in the state treasury and in a certain special fund therein and to be thus made available to said Board for the purpose to which the successive installments of said appropriation were to be applied under the terms of the act making such appropriation. The act of 1919 above referred to expressly provided both by its title and by the terms of section 1 thereof that the purpose of the state in making said appropriation of $3,000,000 was that of "co-operation in the construction of the public

works included in and provided for by that certain project heretofore adopted by the Reclamation Board known as 'Sutter-Butte By-Pass No. 6 of Sacramento and San Joaquin Drainage District.' '' The act further provided in section 4 thereof that, ''The controller of the State of California shall . . . during the fiscal year commencing on the first day of July, 1925, draw his warrant in favor of said Reclamation Board for the sum of three hundred thousand dollars; and shall . . . during the fiscal year 1926, commencing on the 1st day of July, 1926, draw his warrant in favor of said Reclamation Board for the sum of three hundred thousand dollars.'' The act further and in the same section provides that, ''The treasurer of the State of California is hereby directed to pay each of said warrants out of any moneys in the State treasury not otherwise appropriated. All of said sums shall be applied by the Reclamation Board in the manner as provided by section 1 of this act.'' Recurring to section 1 of said act we find that the closing clause thereof reads as follows: ''There is hereby appropriated the sum hereinafter set forth out of any moneys in the State treasury, not otherwise appropriated, to be paid to the said Reclamation Board, for the benefit of the said Sacramento and San Joaquin Drainage District, in connection with the Sutter-Butte By-Pass Project No. 6, or any modifications or amendments thereof that may hereafter be made, in accordance with law, the same to be applied as it is now or may hereafter be provided by law by the said Reclamation Board, in connection with said Sutter-Butte By-Pass Project No. 6 of the said Sacramento and San Joaquin Drainage District.''

[1] It would appear from the foregoing provisions of said appropriation act that it is the present duty of the state Controller to draw and deliver to the Reclamation Board his warrant in favor of said Board for such sums as have been made available for the uses of said Board by virtue of the fact that the installments of said total appropriation for the fiscal years 1925 and 1926 have become payable. It is not denied that the sum of $590,920.92, being approximately the aggregate of these two installments, is presently available in the state treasury. We can, therefore, see no reason why the state Controller should not be required to draw his warrant for such aggregate sum in

favor of the Reclamation Board; nor can we discover any valid reason why the state Treasurer should not be directed to pay said warrant out of such available funds, the same to be applied by the Reclamation Board in the manner provided by the last above-quoted provision of section 1 of said appropriation act.

Thus far we can see no objection to granting this writ, but when we look to the further purposes for which the petitioners seek to have a writ of mandate issue herein we are confronted with a more serious situation. The petitioners in substance aver that as the result of operations carried on in the course of the work of reclamation and flood control by said Reclamation Board for the benefit of said Sacramento and San Joaquin Drainage District with special reference to Sutter-Butte By-Pass Project No. 6 prior to July 27, 1919, there were issued and are now outstanding and unpaid warrants drawn against Sutter-Butte By-Pass Assessment No. 6 in the sum of $1,390,509.59 principal, upon which the interest accrued prior to February 6, 1926, amounts to the sum of $716,747.91; that subsequent to July 27, 1919, in pursuance of the further prosecution of said work warrants against said Sutter-Butte By-Pass Assessment No. 6 have been issued by said Reclamation Board in the further sum of $7,475,375.22 principal, upon which sum interest up to February 4, 1926, had accrued in the sum of $1,921,607.62; that the authorized bonds of the Sacramento and San Joaquin Drainage District which are based upon and are secured by Sutter-Butte By-Pass Assessment No. 6 amount to the sum of $7,133,000 and that said bonds to the extent of said last named sum remain unsold; that the owners and holders of certain of the earliest registered unpaid warrants issued prior to July 27, 1919, are desirous of purchasing the said bonds of said Sacramento and San Joaquin Drainage District at par to an amount which would be redeemable through the use of the said sum of $590,920.92 available out of the installments which have become payable during the years 1925 and 1926 on account of said appropriation, *provided* said bonds so purchased by them to that amount are *forthwith* redeemed by such use of said moneys; that the petitioners herein have approved said plan and proposition on the part of said warrant-holders and have accordingly adopted a resolution

so providing, in which resolution it is further provided that the Controller of the state of California be and is hereby directed to immediately draw his warrant or warrants in favor of said Reclamation Board in the sum of $590,920.92, and that the Treasurer of the state of California be and he is thereby directed to pay said warrant or warrants out of any money in the state treasury not otherwise appropriated and that thereupon said money shall be deposited with the state Treasurer as a special fund for the redemption of such bonds; and that when said bonds have been sold as aforesaid that the state Controller be and he is thereby directed to authorize the state Treasurer, and the state Treasurer be and is thereby directed to place the money derived from the sale of said bonds, less certain expenses of sale, to the credit of the construction fund of said assessment as provided in section 40 of the Bonding Act (Stats. 1919, p. 1092), and that said state Treasurer be and he is thereby further directed to pay warrants payable out of said fund in the order of their registration.

The foregoing averments of the petitioners suggest a number of interesting problems, but we seriously question whether they present an aspect of the situation with which this court is either required or permitted presently to deal. Section 4 of the Appropriation Act of 1919, after providing for the amounts and times of payment of the annual installments on account of said appropriation proceeds to state that ''all of said sums shall be applied by the Reclamation Board in the manner as provided by section one of this act.'' Section 1 provides that said appropriation is ''to be applied as it is now or may hereafter be provided by law by the Reclamation Board in connection with said Sutter-Butte By-Pass Project No. 6 of the Sacramento and San Joaquin Drainage District.'' [2] The appropriation act of 1919 was adopted by the legislature of that year contemporaneously with two other acts having application to the affairs of the Sacramento and San Joaquin Drainage District. This being so, these three acts are for purposes of interpretation to be read together. (*Sacramento etc. Drainage Dist.* v. *Johnson,* 192 Cal. 211–218 [219 Pac. 442].) The first of said acts to be considered is the act approved May 27, 1919 (Stats. 1919, p. 1122), purporting to

amend the general Reclamation Board Act approved December 24, 1911 (Stats. 1911, Ex. Sess., p. 117), and the several later amendments made thereto. By its terms a new section was added to said enactment numbered section 34, and in which new section it was provided that "all moneys which may be hereafter paid to the said Reclamation Board under and by virtue of the provisions of an act entitled an act" etc. (referring to the appropriation act contemporaneously adopted), "shall be applied on said Sutter-Butte By-Pass Assessment No. 6 by said Reclamation Board, to the *pro rata* payment of such portions of said assessment as are based upon flood control benefits." The said added section further provides that, "The moneys so received by the Reclamation Board from the state shall, unless bonds based upon said assessment shall have been authorized by law, be by the Reclamation Board paid over forthwith to the state Treasurer, to be used and expended in the same manner as funds collected from land owners upon said assessment. But if at the time of the receipt of any such money by the Reclamation Board from the state, bonds based upon said assessment shall have been authorized by law, the money so received from the state shall be deposited by the Reclamation Board with the state Treasurer to be held as a special fund for the redemption of such bonds and shall, under the direction and as required by the Reclamation Board, be applied to the payment and cancellation of such bonds in the manner following, to-wit": The foregoing provision of said act as enacted in 1919 has direct reference to the other of said three enactments contemporaneously adopted, viz., the act entitled "An act to authorize the issuance and sale of bonds of the Sacramento and San Joaquin Drainage District based upon assessments levied by the Reclamation Board upon lands in said district." (Stats. 1919, p. 1092.) The above enactment embraces the details of a procedure for the authorization, issuance, sale and redemption of bonds of said district in aid of the endeavor of the Reclamation Board to finance the already accrued cost of the work of reclamation and flood control, which had been in progress during several previous years in connection with Sutter-Butte By-Pass Project No. 6, through the issuance and sale of the bonds of said district to an amount substantially corresponding

to the cost of said work and which bonds were to be re-deemed out of funds to be collected by the Reclamation Board by means of the assessment already levied upon the lands of the property owners in said district, but which had thus far for several reasons remained uncollected, and also out of such other moneys as might come into the hands of said Board from such sources as are designated in the provisions of one or the other of said contemporaneously adopted enactments. When the bonds of said district have been duly authorized, validated and executed in accordance with the earlier provisions of said bonding act, section 33 thereof provides: "The state treasurer shall receive and place the said bonds to the credit of said Sacramento and San Joaquin Drainage District, and shall when and as directed by the Reclamation Board sell any of said bonds, for the best price obtainable therefor, but in no event for less than ninety-five per cent of the face value of such bonds and the accrued interest thereon. Before making a sale of any of said bonds, notice shall be given by the state treasurer that he will sell a specified amount of said bonds, stating the day, hour and place of said sale. Such notice shall state that sealed proposals will be received by him for the purchase of said bonds or any part thereof at the day and hour named in the notice. Such notice shall be given by publication once a week for three successive weeks in a newspaper of general circulation published in the city of Sacramento. At the time and place appointed in said notice the state treasurer shall open the bids and shall award the purchase of the bonds or any part thereof to the highest responsible bidder, or if the highest bid is not equal to par and accrued interest he shall notify the Reclamation Board of the amounts of the highest bids received, and reject any or all bids if so required by said board." It is further provided in section 34 of said bonding act: "The money derived from the sale of any of said bonds shall be received by the state treasurer and shall be by him safely kept and placed to the credit of the Sacramento and San Joaquin Drainage District in a fund to be designated as the 'construction fund of (giving name and number of the assessment upon which the bonds are based),' and may be drawn and expended upon warrants drawn by the state controller at the request of the Reclamation Board

upon and payable out of said construction fund, in the same manner as provided by section fifteen of the said reclamation board act with reference to the expenditure of moneys collected upon assessments as in said reclamation board act provided.'' It will thus be seen from an examination of the foregoing and the other provisions of these three contemporaneous enactments that a complete statutory method of procedure was therein provided for the procurement of the moneys required to finance said work of reclamation and flood control within said district; that in·accordance with such method when an assessment had been levied and duly validated and when the issuance of bonds to the amount thereof had been duly authorized, and when the validation of such bonds had been judicially accomplished, such bonds, or such amount thereof as may by the Reclamation Board be deemed advisable are to be offered for sale by the state Treasurer under the direction of the Reclamation Board in accordance with the method provided by section 33 of the said bonding act. The method thus provided for the sale of such bonds is as follows: Before making such sale, notice shall be given by the state Treasurer that he will sell a specified amount of said bonds, stating the day, hour and place of such sale and at which time and place sealed proposals will be received by him for the purchase of said bonds or any part thereof. At the time and place appointed in said notice he shall open the bids and award the purchase of the bonds, or any part thereof, to the highest responsible bidder. If the highest bid is not equal to par and accrued interest he shall notify the Reclamation Board of the amounts of the highest bids received and reject any and all bids if so required by the Reclamation Board. If the bonds are sold to the highest responsible bidder the money received therefor from such bidder by the state Treasurer shall be by him placed to the credit of the Sacramento and San Joaquin Drainage District in a fund to be known as the ''construction fund,'' and may be drawn and expended upon warrants drawn by the state Controller at the request of the Reclamation Board in the same manner as is provided by section 15 of the Reclamation Board Act (Stats. 1913, p. 272), amended by (Stats. 1925, p. 615), with reference to the expenditure of moneys collected upon assess-

ments as in said act provided. When such bonds have been thus sold and transferred to the purchaser or purchasers thereof, upon receipt by the state Treasurer of the purchase price they are subject to redemption in the manner provided in the succeeding sections of said bonding act by the application thereto of the money received by the Reclamation Board through the collection of the assessment already levied upon the lands within said district and from such other moneys as may have been received by the Reclamation Board from the state under the provisions of the contemporaneous appropriation act and in accordance with the provisions of section 34 of the Act Amendatory of the Reclamation Board Act.

[3] It will thus be apparent from a consideration of the foregoing provisions of these several acts as they existed prior to the year 1923 that a precise statutory mode of procedure had been designated for the provision of the funds required to pay the cost of the work done in the way of reclamation and flood control within said Drainage District. It requires no authority to sustain the proposition that the mode thus provided is the measure of the powers and duties of those state agencies and officials who are charged with the prosecution of said work and with the disposition of the funds derived from the foregoing several sources in payment of the cost of such work and of the outstanding warrants which evidence such cost. It is to be noted at this point in the discussion that section 34, which was added to the Reclamation Board Act in the year 1919, was amended in the year 1923 by the adoption, as an emergency measure, of an act (Stats. 1923, p. 640), which had for its purpose, as expressly set forth therein, the making available of certain moneys which had come into the state treasury since the year 1919 from the receipt of certain installments payable and paid under the provisions of the said appropriation act of that year, in order to carry forward the constructive work upon Sutter-Butte By-Pass Project No. 6. The provisions of said amendment to said section 34, as adopted in the year 1919, were the subject of comment and construction by this court in the two cases of *Sacramento and San Joaquin Drainage Dist.* v. *Johnson,* 192 Cal. 211 [219 Pac. 442], and *Sacramento and San Joaquin Drainage Dist.* v. *Riley,*

194 Cal. 624 [229 Pac. 957]. The petitioners herein do not, however, rely upon any of the provisions of said act of 1923 in support of their claim of right to the issuance of the writ sought herein by any averment in their petition; while in their briefs and also in the briefs of *amicus curiae* in support of their said claim reliance upon the terms of said amendment is expressly disclaimed. In other words, the petitioners herein have based their asserted right to the remedies sought herein solely upon the provisions and procedure of the several enactments of the legislature adopted in the year 1919, to which reference has above been made. Keeping in mind, therefore, the foregoing provisions of these several enactments, we may again recur to the averments of the petitioners' application herein for the purpose of determining whether the procedure outlined therein has been so far followed by these petitioners as to entitle them to still further invoke the processes of this court so as to compel the respondents herein, or either of them, to take any further present action in the due performance of their official duties than that which they have either taken or have been thus far directed to take. By so doing we discover that neither these petitioners nor the warrant-holders in whose interest they are assuming to act have complied or even attempted to comply with the provisions and procedure outlined in said enactments of 1919, and which are essential prerequisites to the remedies they herein seek to invoke. The following are some of the most serious defects of their petition in the foregoing regard: The petitioners, after alleging the due authorization for the issuance of the bonds of said district under the aforesaid bonding act and also the due execution and deposit of said bonds in the office of the state Treasurer as required by said act; and the termination of judicial proceedings validating said bond issue, proceed to aver that the Reclamation Board thereupon proceeded to direct the state Treasurer to offer for sale said bonds; that "notice of said sale of said bonds was given by the state Treasurer from time to time as directed by the State Reclamation Board, but notwithstanding said offers of sale no offer has been made for the purchase of said bonds except as hereinafter specifically set forth." In another portion of their application the petitioners aver that "the board has not

been able to sell said bonds or any of them." [4] Before proceeding to further consider what offer or offers to purchase said bonds, or any of them, have been made according to the averments of the petition herein, it is important to take note of the only mode and method by which offers to purchase said bonds *could* be made under the provisions of the bonding act above set forth. That mode or method consists in the submission of sealed proposals or bids for such portion of such bonds as the bidder or bidders wish to purchase at the time and place fixed for the sale of said bonds in the notice of such sale given by the state Treasurer. "At the time and place appointed in said notice the state treasurer shall open the bids and award the purchase of the bonds or any part thereof to the highest responsible bidder." Such bid or bids for such bonds may be in a sum *above* par, or *at* par with accrued interest; but if the highest bid is not equal to par and accrued interest the state Treasurer shall notify the Reclamation Board of the highest bids received and may, if directed by it, reject all bids. [5] Do the petitioners herein allege that any such procedure has been pursued? They do not, but in lieu thereof they proceed to allege, "That the owners and holders of certain of the said registered unpaid warrants drawn against 'Sutter-Butte By-Pass Project No. 6, prior to July 27, 1919, have offered to purchase bonds of said Sacramento and San Joaquin Drainage District based upon and secured by 'Sutter-Butte By-Pass Assessment No. 6,' at par to an amount equal to the amount which can be redeemed out of said moneys so accrued to date as aforesaid under said state appropriation provided that proceeds from said bond sale are deposited for the liquidation of warrants drawn against 'Sutter-Butte By-Pass Assessment No. 6' in the order of their registration, and that said bonds so purchased be forthwith redeemed out of said $590,920.92 so available, as aforesaid, for bond redemption." It is plainly to be seen that the foregoing averment of a conditional offer upon the part of the "owners and holders of certain warrants" to purchase the amount of such bonds specified therein utterly fails of even a semblance of compliance with requirements of the bonding act regulating the mode and manner by which the said bonds of the district may be bid for and sold. [6] The warrant-holders in

respect to the purchase of said bonds are in no different position as bidders therefor than any other would-be purchaser of said bonds, and it cannot surely be contended that either the state Treasurer or the Reclamation Board would be justified in selling and issuing these bonds to any person who might happen to offer to purchase the same at *par* without any regard for or attempted compliance with the foregoing rigid requirements of these statutes regulating the mode and manner of their disposal. [7] One of the main reasons why bonds of public bodies or agencies are required to be sold at public bidding, after notice is that they may be sold, if possible, for a sum *above par* if a responsible bidder in such sum can thus be secured. It thus becomes apparent that the proposed purchasers of these bonds have in no respect complied, in either letter or spirit, with the provisions of said statute regulating the mode and method of their sale. But, even if they had done so, or if the petitioners herein had so alleged, they would still have come far short of being shown to be entitled either to receive said bonds as the purchasers thereof, or to have any action taken in the way of the redemption of said bonds, since it nowhere appears that the would-be purchasers of said bonds have paid into the state treasury the sum of money they are alleged to have proposed to pay as the purchase price thereof; on the contrary, it appears from the express averments of the petition herein that the aforesaid proposed purchasers of said bonds do not intend to pay any sum whatever into the state treasury, since by the very terms of their conditional bid for said bonds, the procedure that they propose is that of turning over the warrants owned and held by them to the amount in value of $590,920.92 in payment for said bonds, equaling in par value said amount, when and whenever the state Controller and the state Treasurer shall consent to pay over to them said sum of money in redemption of said unsold, undelivered and as yet unpaid-for bonds. The further specific relief which the petitioners herein demand in the prayer of their petition is that said respondents and each of them be directed "to place all moneys derived from sale of bonds based upon and secured by Sutter-Butte By-Pass Assessment No. 6, after retaining such sums as may be necessary in accordance with the provisions of section 36 of said

bonding act, to the credit of the construction fund of said assessment as provided in section 40 of said bonding act." In view of the fact, as affirmatively shown by the petition herein, that thus far no moneys derived from any sale of bonds have yet been received by respondents or either of them for the reason that no bonds have been sold, it seems plain that the petitioners are not presently entitled to the relief above demanded. The further prayer of the petitioners is that the respondent Charles G. Johnson, as state Treasurer, be directed "to pay warrants payable out of such Sutter-Butte By-Pass Assessment No. 6 as funds become available therefor in their proper order of registration as provided in section 15 of the 'Reclamation Board Act' and of section 40 of said Bonding Act." But since, as we have hereinbefore sought to make plain, these provisions of said act are not available for such purpose when the bonds of the district have been authorized and are subject to sale for the provision of funds for the payment of such warrants; and since such bonds have been so authorized but still remain unsold, the petitioners herein are not, upon the facts as set forth in their said petition, entitled to any present writ embracing the direction which they last above seek.

[8] It follows from what has heretofore been stated in this opinion that the petitioners herein are entitled to the issuance of a writ of mandate directing the respondent herein Ray L. Riley, as state Controller, to forthwith draw his warrant or warrants in favor of the petitioner Reclamation Board in the sum of $590,920.92, and further directing the respondent Charles G. Johnson, as state Treasurer, upon the due presentation of said warrant or warrants to deposit said sum of $590,920.92 in the state treasury to be held as a special fund for the redemption of bonds based upon and secured by Sutter-Butte By-Pass Assessment No. 6; but that said petitioners are entitled to no other and further relief upon the facts as set forth in their petition herein.

Let a writ of mandate accordingly issue.

Shenk, J., Curtis, J., Seawell, J., and Waste, C. J., concurred.

THE COURT.—[9]   A rehearing was granted here upon
the request and stipulation of the respective parties hereto
in order that the court might consider and determine a
further question not presented upon the former record, but
which seems to be embraced in the additional considerations
set forth in said stipulation.   The question thus presented
is this:   Had the legislature the power by and under the
several acts of 1919 to provide for an appropriation of public
money to be applied to the redemption of bonds issued or
to be issued under said acts when the proceeds from the
sale of such bonds had been or were to be devoted to the
payment of outstanding warrants issued prior to July 27,
1919, the date of said enactments, and which warrants
had been issued in the prosecution of the work of recla-
mation and flood control undertaken in pursuance of the
Reclamation Act of 1911 and of the amendments thereto
made prior to the year 1919?   It is the contention of
the respondents herein that any application which the
Reclamation Board might make or attempt to make of the
installment or installments which would come under its
control by virtue of our decision herein, to the redemption
of bonds the proceeds of the sale of which had been or
were to be applied to the payment of warrants issued on
account of construction work done by such Drainage Dis-
trict prior to the year 1919, and to the date of approval of
said appropriation act, would be void as in violation of sec-
tions 31 and 32 of article IV of the Constitution relating to
gifts of public money.

[10]   We are unable to agree with this contention.   The
work of reclamation and flood control in that important and
extensive region which is embraced within the boundaries of
the Sacramento and San Joaquin Drainage District is and
from its earliest inception has been considered to be essen-
tially a public project undertaken by the state of California
in its interest and in the interest of its people at large.
It was so regarded by the state in its action approving the
report of the California Debris Commission in the year
1911 and by the act of its legislature of that year (Stats.
1911, Ex. Sess., p. 117).   It was expressly declared to be
such by the enactment of the legislature of the following
year amending said former act (Stats. 1913, sec. 7, p. 252–
266), wherein it was stated that, ''The state of California

and the people thereof are hereby declared to have a primary
and supreme interest in having erected, maintained and pro-
tected on the banks of the Sacramento and San Joaquin
rivers and their tributaries and the by-passes and overflow
channels mentioned herein, good and sufficient levees and
embankments or other works of reclamation, adequately pro-
tecting the lands overflowed by said streams, and confining
the waters of said rivers, tributaries, by-passes and overflow
channels within their respective channels, and it shall be
the duty of the Reclamation Board at all times to enforce
on behalf of the state of California and the people thereof
the erection, maintenance and protection of such levees, em-
bankments and channel rectification as will, in their judg-
ment, best serve the interests of the state of California.''
The foregoing declaration on the part of the legislature as
to the public nature of the work of reclamation and flood
control which had been and was to be undertaken and car-
ried forward to completion was in entire harmony with the
conclusion which had been already reached and declared by
this court as to the essentially public nature of such work
in that region in the case of *People* v. *Sacramento Drainage
District,* 155 Cal. 373, [103 Pac. 207], and in which case
the court also concluded that since such work was essentially
of such public character and benefit the legislature in so
determining had power to provide either for the payment
of the entire expense of such public work by the state itself
through direct appropriations therefor, or to provide that
some portion of the expense thereof might be imposed upon
the adjacent lands specially benefited thereby, by means of
assessments in proportion to such benefits. It was doubtless
the foregoing declaration by this court upon both of the
above questions which guided the framers of the legislation
of the year 1913 (Stats. 1913, *supra*) and of the subsequent
acts in amendment and amplification thereof down to and
including the action of the legislature undertaken in the
year 1919 in the three contemporaneous acts of the latter
year. It is not necessary herein to review with much of
detail the course of that legislation, in view of our detailed
recital and examination thereof in recent cases. Two ob-
servations may, however, at this point in the discussion be
aptly made. [11] The first of these is that the state
legislature in distributing the proposed work of reclamation

and flood control in this vast region among the various reclamation and drainage districts which were formed for its prosecution under the general control of the Reclamation Board, was not to be understood as creating separate and independent entitles for the carrying forward of such purposes, but was calling into being certain agencies of the state in the form of such reclamation and drainage districts for the more convenient handling of the intricate and involved details of such a gigantic undertaking. This was expressly so held by the appellate tribunal in the case of *Argyle Dredging Co.* v. *Chambers,* 40 Cal. App. 332–342, [181 Pac. 84], and also in the case of *Reclamation Board* v. *Chambers,* 46 Cal. App. 476–481, [189 Pac. 479], both of which decisions had special reference to the Sacramento and San Joaquin Drainage District, and both of which have been given the full approval of this court in its recent decisions enunciating the same principles affecting the same district. [12] The fact that the state of California saw fit to commit the details of the prosecution of the work of reclamation and flood control to the various reclamation and drainage districts provided for in the several and successive legislative enactments creating these agencies and defining the scope of their activities, procedure and powers within the same, is not to be taken to have in any degree affected the attitude of the state toward the project in its entirety as to its being a public work conceived and carried forward chiefly for the benefit of the state and of its people at large. The fact that the owners of lands lying within the areas to be affected and benefited by said project and work would also be directly benefited through the restoration of their said lands to fertility and cultivation could not be held to affect the right and power of the state to provide from its public treasury all of the moneys required in the course of undertaking and carrying to completion said work. It was so expressly declared in the cases of *Argyle Dredging Co.* v. *Chambers* and *Reclamation Board* v. *Chambers, supra,* which, as we have seen, have met with the approval of this court. [13] This being so, we are led to our second observation, which is that the fact that the legislature, in the adoption of the plan or project for the prosecution of said work and for the provision of the funds whch would be required in the course thereof, which is to be found em-

bodied in the provisions of its enactments in 1913, 1915 and 1917, saw fit to impose the chief burden of providing such funds upon the land owners within the areas which were or were to be directly and beneficially affected through the prosecution and completion of said plan or project, did not, in any manner or to any extent, affect or diminish the power of the state through the action of its legislature to determine what portion of the burden of the cost of such improvement it would bear, nor how nor in what manner nor to what extent nor at what time it would resolve by appropriate legislation to assume and bear the same, or such proportion thereof as the development of such work might disclose to be just and practical and proper in order to carry the same to a successful consummation. **[14]** Nor do we think that the fact that the legislature in connection with the appropriation of the sum of $100,000 which it made in the year 1913 for the use of the Reclamation Board (Stats. 1913, p. 276) undertook to declare that, ''The state of California shall not be liable, directly or indirectly, for any obligation, claim or liability of any kind or character, arising under, or by reason of this act, or any of the provisions thereof, in excess of the one hundred thousand dollars in and by this act appropriated,'' can be held to have limited the power of the state through later legislation to make such further appropriations or direct the application thereof to the payment of the cost of such work as the progress thereof might seem to require.

With the foregoing considerations in mind we shall briefly review the salient facts in relation to the progress and cost of the work of reclamation and flood control within the Sacramento and San Joaquin Drainage District between the years 1913 and 1919 inclusive. By the act of 1911 (Stats. 1911, Ex. Sess., p. 117), the Reclamation Board, conformably to the report of the California Debris Commission, approved by said act, was created and its powers in the way of control over all plans and work for the reclamation and flood control along or near the Sacramento River and its tributaries were generally declared and defined. By the act of 1913 amending and amplifying said former act the drainage district to be known as Sacramento and San Joaquin Drainage District was created, its boundaries defined and its powers, and procedure under the direction and control of the Reclamation Board outlined. By the terms of said act the

Reclamation Board was invested with large powers in the way of acquiring lands, levees, easements and all such other property or material requisite or necessary for by-passes, canals, overflow channels, embankments and such other purposes as would be needful in the execution of the general project of reclamation and flood control within said district. The board was also empowered to levy an assessment or assessments upon the lands within said district for the provision of money needed for the carrying out of the foregoing purposes; which money when collected by the methods provided for in said act, together with all other moneys received from any source, was to be deposited with the state Treasurer in a fund which was thereby created to be known as the "Sacramento and San Joaquin District Fund"; and was to be paid out upon warrants to be drawn by the state Controller upon said fund upon the presentation to him of drafts of the Reclamation Board for construction work. In case there was not sufficient funds on hand for the payment of such warrants the state Treasurer was to indorse thereon the date of presentation and register the same; and such warrants were to draw interest thereafter at the rate of seven per cent per annum and were eventually to be paid in the order of their registration. The sum of $100,000 was appropriated for the use of the Reclamation Board, one-half of which was to be repaid the state out of the moneys received from the assessment levied and collected; and, as we have seen, the responsibility of the state for the work done or the liabilities incurred by the district in excess of the amount of said appropriation was limited thereto. The work of reclamation and flood control went forward under the provisions of said act and also of the act of 1915 amendatory thereof, wherein in section 7 thereof (Stats. 1915, pp. 1338–1340) it was again expressly declared that the state of California and the people thereof "have a primary and supreme interest" in the work of reclamation and flood control conceived and being carried forward along the Sacramento and San Joaquin Rivers and their tributaries and the lands subject to overflow by said streams. By the terms of section 20 of said act of 1915 the sum of $50,000, which by the terms of the act of 1913 was to be repaid into the state treasury, was reappropriated for the use of the Reclamation Board in the form of a continuing revolving fund, was to be

199 Cal.—44

used by the Reclamation Board from time to time for any purpose for which the funds of said board or of said district, "whether raised by assessment or otherwise provided may be lawfully used." In the meantime the preliminary details for the levy and collection of an assessment for the purpose of providing the funds required for the prosecution of the work of reclamation and flood control were being worked out by the Reclamation Board under many difficulties arising out of the magnitude of the undertaking and the involved and often conflicting rights of those interested in and to be primarily burdened thereby. The resultant delays and impediments in the course of determining the amount of the assessment and the proper distribution of its burdens necessarily resulted in the present depletion of the meager funds which had already been provided during the initial stages of the project to such an extent that by the beginning of the year 1919 the registered and outstanding warrants drawn against said fund amounted to the sum of $1,340,-358.47 with accrued interest. In the meantime the amount of the assessment, which had, after various amendments, been fixed at the sum of approximately $10,600,000, but which was subject to still further changes, remained uncollected except as to a small portion thereof, and was being impeded as to its levy and collection by litigation in various forms. Such was the condition of the project of reclamation and flood control within said district with which the legislature of 1919 was confronted. It was abundantly apparent that the state of California must provide remedial legislation of some sort in aid of its imperiled project of reclamation and flood control. The legislature of 1919 accordingly adopted the three contemporaneous acts of that year, the nature, object and interpretation of which have been set forth in detail by this court in the case of *Sacramento & San Joaquin Drainage District, etc.,* v. *Johnson,* 192 Cal. 211 [219 Pac. 442]. The only one of these three contemporaneous acts with which we are particularly concerned in the instant proceeding is that providing for an appropriation of $3,000,000 in aid of said project. The purpose of said appropriation as expressed in section 1 of the act was that "of co-operation in the construction of public work included in and provided for by that certain project heretofore adopted by the reclamation board known as

Sutter-Butte by-pass Project No. 6 of the Sacramento and San Joaquin Drainage District.'' The act further contains the general provision that the money thus appropriated is to be paid to said Reclamation Board ''for the benefit of said Sacramento and San Joaquin Drainage District in connection with said Sutter-Butte by-pass Project No. 6 or any modifications or amendments thereof that may be hereafter made in accordance with law, the same to be applied as it is now or may hereafter be provided by law.'' The foregoing provisions of said act are somewhat further clarified by a reference to the provisions of the contemporaneous act of 1919 [Stats. 1919, p. 1130] purporting to amend section 34 of the Reclamation Board Act of previous years, wherein direct reference is made to the appropriation provided for in its companion statute by the provision to the effect substantially that all money which may be paid to the Reclamation Board in aid of carrying out the project of reclamation and flood control under any statute then in existence ''or by any law of similar import which has been or may hereafter be adopted by the legislature of the state of California, shall be applied on said Sutter-Butte by-pass assessment No. 6 by said reclamation board to the *pro rata* payment of such portions of such assessment as are based upon flood control benefits''; and said amendment to said section 34 further provided that ''the money so received by the reclamation board from the state shall, unless bonds based upon said assessment shall have been authorized by law, be by the reclamation board paid over forthwith to the state treasurer and by him credited to the funds of said assessment to be used and expended in the same manner as funds collected from land owners upon said assessment. But if at the time of the receipt of any such money by the reclamation board from the state bonds based upon said assessment shall have been authorized by law the money so received from the state shall be deposited by the reclamation board with the state treasurer to be held as a special fund for the redemption of such bonds and shall, under the direction and as required by the reclamation board, be applied to the payment and cancellation of such bonds.'' The clear intendment of the above interlocked provisions of these two contemporaneous acts is that whatever moneys became available to the Reclamation Board from the re-

source of said $3,000,000 appropriation was, unless otherwise directed by the legislature, to be applied to identically the same purposes to which the moneys derived or to be derived from an assessment or from whatever funds were to be provided by an authorized bond issue in and of such assessment were to be applied; that is to say, to the payment of the outstanding indebtedness of the drainage district in the form of the issued, registered but unpaid warrants which had been drawn by the district against the aforesaid fund of the Reclamation Board, regardless of the time when such warrants had been issued, but in the order of their registration. It is thus made plain that it was the purpose of the legislature through the passage of these three contemporaneous remedial acts to provide a speedy method for the liquidation of the outstanding obligations of the drainage district in the form of these issued and registered warrants which it had duly issued for work done upon this vast public project, and that the appropriation of $3,000,000 thus made by it was, unless otherwise directed, to be applied to the payment of such obligations, regardless of whether they had arisen before or were to arise after the adoption of said enactments. By so providing, the legislature of 1919 recognized and in a very definite sense reaffirmed the express declarations of the legislatures of 1913 and 1915 as to the essentially public nature of the project for reclamation and flood control within said drainage district and the supreme interest of the state of California and of its people therein and in the ultimately successful consummation thereof.

[15] This being so, and it having been already determined that in view of the essentially public nature of said project the state of California might properly have undertaken to pay the entire cost of its prosecution at the time of its inception, we are brought face to face with the proposition as to whether the state might not also at any stage in the prosecution of said public work undertake to assume and bear such portion of the burden as it might see fit through appropriate legislative action, notwithstanding the fact that it might for the time being have laid that burden upon others; that is to say, upon the land owners of said district, by whom it was reluctantly or indifferently being borne, with the effect of delaying or endangering the success-

ful consummation of the project itself. We entertain no doubt that the state in its sovereign capacity had power so to do and that in so doing to the extent of its appropriation of $3,000,000 made by the enactment of 1919, or of so much as may become available to the uses of the Reclamation Board, as the installments thereof fall due, unless otherwise diverted under the terms of said act, the state legislature would not be violating the constitutional inhibition against gifts of public money. In the case of *City of Oakland* v. *Garrison,* 194 Cal. 298 [228 Pac. 433], this court considered the scope of section 31 of article IV of the constitution as to its application to appropriations of public money in aid of projects which were essentially public in their character as distinguished from such appropriations for purely private purposes, and in so doing distinguished the earlier case of *Conlin* v. *Board of Supervisors,* 114 Cal. 404 [33 L. R. A. 752, 46 Pac. 279], from the facts of the later case; and this court in upholding the validity of the instant appropriation decided that the fact that incidentally a private use or benefit might thereby be subserved did not affect the validity of the appropriation, the main purpose and benefit thereof being a public one. We deem the principles declared in that case and the authorities therein relied upon in support of its ruling directly applicable to the instant situation. It is, however, argued by the respondents herein that this court in the cases of *Sacramento & San Joaquin Drainage District* v. *Johnson, supra,* and of *Sacramento & San Joaquin Drainage District* v. *Riley,* 194 Cal. 624 [229 Pac. 957], has decided that the owners and holders of warrants for construction work or materials furnished said district prior to the adoption of the acts of 1919 did not have a vested right to compel the application of any portion of the $3,000,000 appropriation of that year to the preferential payment of their claims. It is true that this court so held in those cases, but it does not follow therefrom that the Reclamation Board may not apply some portion of the moneys derived from said appropriation to the liquidation of said claims when the vastly greater interest and object of such application is that of aiding the advancement of the public project of reclamation and flood control. The fact that the owners or holders of such warrants are to be benefited by the speedier adjustment of their claims

than that already provided through the slower process of the assessment and its collection is but a minor and incidental benefit as compared with the public interest involved, a greater benefit arising from the liquidation of these warrants than that accruing to the holders thereof accrues to the district and the land owners therein through the lessening to the extent thereof of their liability on account of the assessment; but even this benefit is overshadowed by the yet vaster benefit to the state at large from the *pro tanto* advancement of its greater project for reclamation and flood control in the extensive and valuable area within this drainage district; for the confinement of the waters of its principal rivers to their proper channels and for the scientific devotion of such waters to the fructification of its fertile lands. To appropriations of public money for such public purposes the inhibitions of the constitution against gifts of public money can have no application.

The former opinion of this court is hereby reaffirmed.

We do not deem it necessary to extend the compulsions of the writ of mandate, at this stage of the instant proceeding, any further than that already indicated in the main opinion.

Let a writ accordingly issue.